Rex STOCKMAN, Plaintiff-Appellant,

v.

Eugene LaCROIX, Jr., et al., Defendants-Appellees.

No. 85–2664.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1986.

Decided May 7, 1986.

Daniel R. Shulman, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for plaintiff-appellant.

Randolph J. Haines, Lewis & Roca, Phoenix, Ariz., for defendants-appellees.

Before CUDAHY, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

With depressing frequency lawyers and judges overlook questions of subject matter jurisdiction. Sometimes this produces a struggle to find jurisdiction that could have been established with the stroke of a pen. E.g., *Goldstick v. ICM Realty*, 788 F.2d 456, 458 (7th Cir.1986); *Buethe v. Britt Airlines, Inc.*, 787 F.2d 1194 (7th Cir.1986). Sometimes the inattention leads to calamity. See, e.g., *Kanzelberger v. Kanzelberger*, 782 F.2d 774 (7th Cir.1986), dismissing a case for want of complete diversity although it had been tried to conclusion. In this case the pleadings do not establish jurisdiction, but we allow the filing of additional materials that do. The substantive question concerns Wisconsin's statute of limitations for fraud actions, and we conclude that the suit is untimely.

Rex Stockman, a resident of Wisconsin, began raising Arabian horses in 1971. For $35,000 he bought Cognac, son of *Bask +,

a champion Arabian stallion. Stockman bought horses from several sources; one was the Lasma organization, usually represented by Eugene LaCroix, Jr. Stockman had a farm in Wisconsin where he kept some horses. He boarded and bred others at facilities operated by the Lasma organization. Eugene and the Lasma organization sometimes dealt with Stockman as principals, sometimes as Stockman's agents. For a short time Stockman and Lasma ran a joint breeding operation at Stockman's farm. Stockman's daughter Kris spent her summers at Lasma's farm in Arizona, rode on the Lasma show circuit, and married Ray LaCroix, Eugene's brother.

In 1975 Eugene began persuading Stockman to get out of the business, telling Stockman that he lacked enough knowledge to be successful. In 1977 Stockman yielded, selling his horses to Alec P. Courtelis for $150,000, half of which was allocated to the sale of Cognac. Eugene was the go-between. According to the district court, it is uncontested that Eugene "told [Stockman] that he was acting for ... Courtelis, that he would not charge a commission, that he would make a commission only when the horses were later resold, and that [Stockman] would have to keep the price down." According to Stockman, Eugene induced him to keep the price down by representing that Cognac (then boarded at Lasma's farm in Arizona) was lame, could not be a show horse, would never be of any value to Stockman, and that $150,000 was the best price he could obtain. (The facts we recite are those favorable to Stockman. The defendants deny many of the allegations.) Stockman and Courtelis agreed on the price in July 1977, and on July 17, 1977, Town & Country Farms, Ltd., wired $75,-000 to Stockman as a down payment. The parties closed the sale on August 22, 1977. Stockman received some remaining installments from Polish Futures, a partnership.

Eugene gave Stockman good advice in 1975. Cognac was not permanently lame, and the day before the closing Cognac won the Canadian National Park Horse Championship in a demanding category. Kris called her father on August 23 to tell him about the victory. She also said that Cognac "had favorable judges" and was "secure" now that he had won and was in new hands. The parties agree that Cognac, as a champion, was worth between $350,000 and $650,000 on the date of the closing. By 1981, when one of Cognac's foals sold for $600,000, he was worth more. A syndicate acquired Cognac, and the price of some of the shares of the syndicate implies that the horse was worth $2.5 million.

Courtelis was not the sole buyer in 1977. A brochure circulated to the trade (including Stockman) in November 1977 described Cognac as a "Lasma stallion" owned by Polish Futures. Stockman received checks from Polish Futures, and in July 1978 he received a letter from Courtelis implying that Lasma Arabians and Richard Clements were partners with Courtelis in Polish Futures. In February 1982, when Stockman learned of Cognac's syndication, he wrote to Ray LaCroix and complained. Ray later replied "we have got to get this straightened out" and said that "we are going to make this up to you." But Ray did not speak for Eugene. A meeting between Stockman and Eugene broke up after recriminations. Stockman threatened suit; Eugene said that Stockman couldn't stand up to him and didn't dare sue because "you know what it could do to Ray and Kris"; Stockman replied that he did not care, and on February 27, 1984, Stockman carried out his threat.

■ Stockman filed the suit in state court in Wisconsin. It named as defendants Eugene, Courtelis, Town & Country Farms, and two LaCroix entities: Lasma Arabians and Lasma Corp. The complaint alleged that Eugene is a resident of Arizona, Courtelis a resident of Florida, and Lasma Corp. an Arizona corporation with its principal place of business in Arizona. It described Lasma Arabians as "an Arizona limited partnership ... with its principal place of business in Scottsdale, Arizona" and Town & Country Farms as "a Florida limited partnership ... with its principal

place of business in Miami, Florida." By treating the two partnerships as if they were corporations, the complaint created the confusion that dogs this case. For purposes of diversity jurisdiction partnerships are citizens of the states in which their partners reside. In this circuit, that means limited as well as general partners. *Elston Investment, Ltd. v. David Altman Leasing Corp.*, 731 F.2d 436 (7th Cir.1984).

The citizenship of the partners did not matter so long as the case was in state court, but the defendants removed it to federal court, alleging jurisdiction under 28 U.S.C. § 1332 because of complete diversity. The petition for removal, like the complaint, treated the partnerships as if they were corporations, with their own citizenship and principal places of business. Stockman then filed an amended complaint, adding Polish Futures and Lasma Arabians, Ltd., as defendants. The amended complaint described both as "Florida limited partnerships."

■ Instead of catching this mistake the district court repeated it. The court's opinion says, for example, that "Town & Country Farms, Ltd. is a Florida limited partnership. Defendant Courtelis is the general partner of defendant Town & Country Farms, Ltd." We raised the jurisdictional question at oral argument, taking everyone by surprise. The parties knew neither the identity nor the citizenship of the general and limited partners in the four partnerships. Our request for supplemental briefs fetched from Stockman a document stating that the record does not reveal the citizenship of all of the partners; Stockman nonetheless asked us to resolve the case on the merits because the parties had not contested jurisdiction in the district court. Lawyers who practice in federal court must know that jurisdiction of the subject matter may not be conferred by consent. It must be demonstrated, not assumed. *Bender v. Williamsport Area School District*, ── U.S. ──, 106 S.Ct. 1326, 1334, 89 L.Ed.2d 501 (1986). A court is entitled to more from the bar.

■ The defendants' supplemental memorandum asked leave to supplement the record with two affidavits supplying all missing information. We grant this motion on the authority of 28 U.S.C. § 1653, which provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." See *Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 255 n. 1 (4th Cir.1984). The record, now supplemented by the affidavits, establishes complete diversity. Town & Country Farms has three partners: Alec Courtelis, Louise Courtelis, and W. Douglas Pitts. All reside in Florida. The partners of Polish Futures are Lasma Arabians, Richard Clements, and Town & Country. Clements resides in Louisiana. Lasma Arabians is a general partnership of which Eugene, Ray, and Eugene LaCroix, Sr., are the partners; all reside in Arizona. This accounts for everyone except Lasma Arabians, Ltd. This partnership was dismissed from the case on March 18, 1985. We do not know the citizenship of its partners, but diversity jurisdiction may be saved by the dismissal of non-diverse parties. See *Othman v. Globe Indemnity Co.*, 759 F.2d 1458, 1462–63 (9th Cir.1985); *Kanzelberger*, 782 F.2d at 778. Lasma Arabians, Ltd., was added as a party after the removal, so it could not have destroyed the diversity that was essential at the times the suit was filed and removed.

We have now done what the parties and the district court should have done—established that there is complete diversity. The exercise has consumed the time of two teams of lawyers and three judges. It could have been done more quickly had it been done right in the first place. But for the last-minute affidavits, the problem would have led to a remand for further proceedings, doubling everyone's efforts; but for a bit of luck it could have required a remand to state court, as in *Kanzelberger* and *Elston*.

■ The problem with this case on the merits leaps out from the statement of the facts. Stockman sold Cognac on August 22, 1977, and did not file this suit until

February 27, 1984, more than six years later. One day after Stockman closed the deal, he learned that Cognac, a "lame" horse with no future, had won a championship. The district court granted summary judgment to the defendants, concluding that the call from Kris gave Stockman a reason to investigate, which started the period of limitations running. Wis.Stat. § 893.93(1)(b) requires suits alleging fraud to be filed within six years, and this suit was not.

Kris said that Cognac had "favorable judges," but even the most favorable judges do not award a championship in a demanding category to a lame and worthless horse. A reasonable person would have become suspicious. Perhaps this was not enough to prompt an immediate suit, but the period of limitations starts to run when the victim has "sufficient knowledge to make a reasonable person aware of the need for diligent investigation." *Gygi v. Guest*, 117 Wis.2d 464, 467, 344 N.W.2d 214, 215 (App.1984). See also, e.g., *Koehler v. Haechler*, 27 Wis.2d 275, 133 N.W.2d 730 (1965). The time provided by a statute of limitations is not for recuperation after learning enough to prevail at trial. It is for investigation, and because fraud may be hard to unravel the statutory period is substantial. An investigation after the call from Kris would have revealed much. Stockman might have called someone present at the show or knowledgeable about horses to determine whether Cognac was lame or the judges blind. We need not say that a simple investigation was bound to be successful; it is enough that on the day he received the call from his daughter, Stockman should have been aware that something was amiss and the deal might bear investigation. Stockman allowed at his deposition that he knew he "was took", "because how could a horse ... win the Canadian National championship when two months before you were told that he would never be a show horse." Stockman says this is hindsight; it is, but hindsight based on knowledge sufficient to lead a reasonable person to inquire further.

The complaint alleges two frauds, one concerning the value of Cognac and one concerning Eugene's status. Stockman maintains that Eugene defrauded him by appearing to act as a friend, while in fact he was an adverse principal (through Lasma Arabians, a partner in Polish Futures). If Stockman really thought Eugene his agent, then the call from Kris certainly should have put Stockman on inquiry, because Eugene as a fiduciary would have owed Stockman a duty of special candor. The victory of Cognac in a show is something a fiduciary—if that is what Eugene was—should have revealed, and Stockman knew that he had not. Eugene's status as a fiduciary advances the date on which a reasonable person would have begun inquiry. It does not help to characterize Eugene's acquisition of an interest in Cognac as a second fraud, for the inquiry begun after Kris's call would have revealed this too. Stockman had only to read his mail, which characterized Cognac as a "Lasma stallion."

The exchange between Stockman and Ray may have lulled Stockman for a short time, but the maximum time excludable under the equitable doctrine of tolling is the gap between Ray's promise to set things right and Eugene's gruff rejection of Stockman's requests. Stockman filed this suit six years, six months, and five days after the closing. Time consumed in negotiating a settlement is not excluded from the period of limitations, cf. *Seidner v. Town of Colonie*, 79 A.D.2d 751, 434 N.Y.S.2d 800 (1980); *Dickirson v. Pacific Mutual Life Ins. Co.*, 319 Ill. 311, 150 N.E. 256 (1926), and Ray's offer, as a partner of Lasma Arabians, may be characterized as the opening of negotiations. The rejection of a demand for settlement, which is what Eugene did, also does not toll the statute. Even if Ray's offer is characterized as concealment or an effort to lull Stockman, this is unimportant unless the gap between Ray's offer and Eugene's rebuff is more than six months. It is not. Stockman placed the exchange with Ray no earlier than the beginning of July 1982 and the conversation with Eugene no later than the

end of December 1982. That is not enough time to save Stockman's suit.

AFFIRMED.