991 F.2d 800
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
TREXLER, BUSHNELL, GIANGIORGI & BLACKSTONE, LIMITED,
Plaintiff-Appellant,
v.
HORTON COMPANY and Tnemec Company, Incorporated, Defendants-Appellees.
 No. 92-3408.
 United States Court of Appeals, Seventh Circuit.
 Argued April 6, 1993.
Decided April 22, 1993.
 
 Before RIPPLE and MANION, Circuit Judges, and ALBERT J. ENGEL, Senior Circuit Judge.*
 
 ORDER
 
 1
 The law firm of Trexler, Bushnell, Giangiorgi & Blackstone, Ltd. appeals the district court's judgment denying its contract and contract-related claims against the Tnemec Company, Inc. for unpaid legal fees. This judgment followed a bench trial held before a magistrate judge. Appellant contends that the magistrate misinterpreted Illinois contract and partnership law in failing to hold the Tnemec Company liable for the legal fees of its partners. Upon reviewing the record as well as the parties' written and oral arguments on appeal, we agree with the magistrate's decision and AFFIRM for the reasons set forth in his Memorandum Opinion, a copy of which is attached to this Order.
 
 ATTACHMENT
 UNITED STATES DISTRICT COURT
 NORTHERN DISTRICT OF ILLINOIS
 EASTERN DIVISION
 
 2
 Trexler, Bushnell Giangiorgi & Blackstone, Ltd., Plaintiff,
 
 
 3
 v
 
 
 4
 The Horton Company, Tnemec Company, Inc. and Lowell C.
 
 
 5
 Horton, Defendants.
 
 No. 89 C 5716
 Magistrate Judge Weisberg
 Memorandum Opinion
 
 6
 This suit was filed July 25, 1989 by the law firm of Trexler, Bushnell, Giangiorgi & Blackstone, Ltd. (Trexler), seeking to collect unpaid legal fees from its former client, The Horton Company (Horton), Lowell C. Horton (Lowell), president of Horton, and Tnemec Company, Inc. (Tnemec)[1], Horton's partner or joint venturer. The court has jurisdiction under 28 U.S.C. § 1332.[2]
 
 
 7
 The only live dispute is about Tnemec's liability to Trexler; we are not concerned with the other named defendants. A default judgment against Lowell was entered by Judge Plunkett on February 23, 1990. Horton was neither served nor entered an appearance; shortly after suit was filed the court was notified that Horton had filed for bankruptcy. We have not been told what has happened in the bankruptcy proceedings. The remaining parties, Trexler and Tnemec, consented to trial before a Magistrate Judge pursuant to 28 U.S.C. § 636(c) on February 22, 1990 with any appeal to be taken before a District Judge.[3]
 
 
 8
 On February 28, 1991 the court granted in part Tnemec's motion for summary judgment and dismissed Count III of the Second Amended Complaint which sought to recover on a theory of unjust enrichment. A bench trial was held July 16 and 17, 1991 and the parties submitted proposed findings of fact and conclusions of law. Briefing was completed on March 16, 1992. The following constitute the court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.
 
 Facts
 
 9
 There is no material dispute as to the facts, and no material conflicts in the testimony of the witnesses. Trexler is a Chicago law firm specializing in patent law. In late 1983 a Florida attorney representing Horton contacted one of Trexler's shareholder-partners, Raiford Blackstone, and engaged him as local counsel for Horton and Lowell in a suit against The Quaker Oats Company. Horton claimed Quaker Oats was infringing its patent (the Patent) for a polymer concrete product Horton sold under the name "Hortoncrete."
 
 
 10
 Shortly thereafter Blackstone learned that the Patent was the subject of a reexamination proceeding before the Patent Office. Because Horton's Florida attorney was not a patent attorney, he did not understand that this represented a serious threat and had not planned to defend the Patent in the Patent Office. According to Blackstone, the Patent was "on its death bed"--Quaker Oats had presented twenty different references and made serious allegations of misconduct, and without a strong defense the Patent would be declared invalid. Blackstone persuaded Horton to let him represent Horton before the Patent Office, and Horton prevailed in the reexamination and in a second reexamination initiated by Quaker Oats. As best Blackstone could remember, the reexaminations were not concluded until late 1986 or early 1987. During this time Blackstone and Trexler continued to represent Horton in its suit against Quaker Oats. It is stipulated that Blackstone and Trexler's services were competently rendered and that their fees were reasonable.
 
 
 11
 This work generated substantial bills. When he accepted employment, Blackstone explained Trexler's standard fee arrangement--an hourly rate--to Horton's Florida attorney, and Blackstone initially sent Trexler's bills to him. By December 1983 Blackstone was sending statements directly to Horton. In May 1984 Lowell confirmed in a mailgram to Trexler that he would be personally responsible for Trexler's bills. By October of 1984 Horton owed Trexler over $70,000, more than Trexler had ever permitted a client to owe it before withdrawing its representation. What kept Blackstone and Trexler in the game was their commitment to an entrepreneurial David fighting against a well-funded Goliath and the hope that Horton would win a substantial judgment or settlement that would permit it to pay its legal fees.
 
 
 12
 Despite some payments by Horton, the debt to Trexler grew, reaching $100,000 by the end of 1984 and $135,000 by June 1985. In telephone conversations and letters Blackstone pleaded for a substantial payment, for a schedule of payments, for an additional guarantor. None was forthcoming.
 
 
 13
 By the summer of 1985 Horton was looking for either a buyer or a partner with substantial cash. In July Lowell informed Blackstone that a potential purchaser would be willing to purchase Horton and the United States marketing rights to the Patent for $700,000, contingent upon a favorable report from the patent examiner. Lowell assured Blackstone that this would provide ample funds to pay Trexler's bills. Blackstone replied that this was well and good, but payment could not be contingent on the sale. The sale was never consummated.
 
 
 14
 One company Horton approached in the summer of 1985 was Tnemec, a manufacturer of industrial paint coatings. Tnemec was initially interested in purchasing all of the stock of Horton. To keep Horton afloat while negotiations were underway, Tnemec advanced Horton $50,000. When Tnemec learned that Horton owed $150,000 in legal fees and was embroiled in expensive litigation, Tnemec changed its mind. Peter F. Cortelyou, then executive vice president for finance and later president of Tnemec, and Tnemec's vice president for finance and administration, Harold J. Neu, testified that they did not want Tnemec involved with Horton's patent litigation or its past liabilities. The deal was restructured as a joint venture in which Horton would continue to hold the Patent and manufacture Hortoncrete, Tnemec would advance working capital to Horton and be given the exclusive right to market Hortoncrete in the United States and the two companies would split the profits after Tnemec's advances had been repaid.
 
 
 15
 To accomplish this, the parties entered into an agreement dated as of December 2, 1985 (the Agreement). Exhibit 93. Under the Agreement, Horton was to produce Hortoncrete. Id. at 5. Tnemec was given the exclusive right to distribute Hortoncrete in the United States and was given the right to use the trademark "Hortoncrete." Id. at 11. Tnemec was to purchase raw materials, and agreed to reimburse Horton for its operating expenses, for which it was to reimburse itself out of sales. After Tnemec had been repaid for its expenses relating to the venture and the expenses for which it had reimbursed Horton, the rest was profit to be divided equally. Id. at 6-9. At the end of the Agreement's three year term Tnemec would acquire an exclusive license under the Patent for a price based upon the profits earned in the preceding year. Id. at 9. Tnemec had the right to terminate the Agreement if the sale of Hortoncrete resulted in a net loss of $100,000 or more after 18 months, or if the Patent or Horton's rights in it were invalidated or impaired in a number of specified ways. Id. at 3-4.
 
 
 16
 According to the Agreement, Tnemec had loaned Horton $55,000 prior to the date of the Agreement and was to loan Horton an additional $45,000 upon its execution. Id. at 10. The Agreement provides for a promissory note in the amount of $100,000, id., Exh. A, secured by a security agreement, id., Exh. B, giving Tnemec a security interest in the Patent.
 
 
 17
 The Agreement provided that Tnemec would establish the Horton Division of Tnemec, which was to be "not be a separate legal entity but a description of activities relating to the sale of the Product." Agreement at 2. Unless otherwise agreed, no assets were to be owned jointly, but all were to be owned by either Horton or Tnemec. Id. The Agreement states that each party is an independent contractor and not an agent or representative of the other, and that except as stated in the Agreement neither party would have any right or authority to create any obligation or responsibility on behalf of the other. Id. at 12.
 
 
 18
 A bank account funded by Tnemec was opened for the Horton Division and Tnemec and Lowell had authority to withdraw funds. Lowell and other Horton employees, remained (at least formally) employees of Horton. The Horton Division paid the net salaries of Horton employees and paid to Horton the various employment-related taxes that were to be transmitted to taxing authorities.
 
 
 19
 Tnemec kept track of the expenditures from the account. Payments for items not included in the contract were designated as non-reimbursable expenses and treated as advances to Horton. Some of these were authorized by Tnemec in advance, others were not. Tnemec did not demand repayment or take action against Horton or Lowell, although when the Agreement was terminated these unauthorized payments were included in the amount of a promissory note executed by Horton confirming its debt to Tnemec. Tnemec acknowledged that the purpose of one $14,000 advance was to "help offset your legal expenses associated with the Quaker litigation." Exh. 24.
 
 
 20
 The venture was not successful. After losing half a million dollars Tnemec had had enough; the Agreement was terminated by mutual consent on April 1, 1988. Exh. 50. Tnemec paid all of the outstanding trade payables of the Horton Division. The non-reimbursable payments from the Horton Division account that Lowell had approved were added together with the other advances to Horton, including a final loan of $200,000. Horton executed a promissory note for $545,000 to Tnemec secured by a pledge of its stock. The note was never paid. Tnemec never attempted to take possession of the stock or exercise its security interest in the Patent.
 
 
 21
 During the term of the Agreement, the amount due to Trexler for legal fees and expenses mounted from $170,106.67 in December 1985 to $194,620.77 in July 1987 when Trexler finally stopped representing Horton. Exh. 75. Although Tnemec loaned or advanced money to Horton to pay its bills, Trexler was not paid.
 
 Discussion
 
 22
 Trexler's Second Amended Complaint contains three claims against Tnemec. Count III alleges that Tnemec had been unjustly enriched by Trexler's services, since Trexler had preserved the validity of the Patent upon which the joint venture depended. Trexler argued that this was a benefit to Tnemec for which it should be required to pay. We disagreed and dismissed this count on Tnemec's motion for summary judgment because it was undisputed that Trexler had an express contract with Horton to provide these services and Tnemec's incidental benefit did not make it liable for them.
 
 
 23
 Count VI alleges that Horton and Tnemec formed a partnership or joint venture to exploit Hortoncrete, that Lowell and Horton requested legal services from Trexler for the benefit of the joint venture and that in making such requests Horton, through Lowell, was acting in the ordinary course of business of the joint venture, rendering Horton's partner Tnemec liable for the value of the services rendered.
 
 
 24
 Count VII alleges that Tnemec had a contract with Trexler as a result of Lowell's and Horton's requests for legal services on the theory that either or both of them were acting as authorized agents for Tnemec and Tnemec accepted the benefit of those services.
 
 
 25
 The parties have agreed that Illinois law controls.
 
 
 26
 Was There A New Contract For Legal Services?
 
 
 27
 All of Trexler's communications regarding its fees and who was to pay them were entirely with or through Lowell. Any contract with either Tnemec or the partnership could come into being only if Lowell were acting as the agent of one or both of them. As we pointed out in our ruling on Tnemec's motion for summary judgment, it is not necessary that Lowell's agency have been disclosed to Trexler for his promise to bind his principal. Nevertheless, in order for it to succeed on either of its claims Trexler must prove two things: (1) a contract, i.e., a promise of payment by Lowell on behalf of Tnemec or the partnership in exchange for Trexler's continuing to provide services, and (2) Lowell's authority to enter into it.
 
 
 28
 Trexler has shown neither. First, there was no new contract made between Trexler and anyone else--Horton, Tnemec or the joint venture. We find no new promise to pay (or corresponding promise by Trexler to continue to provide services) made after the commencement of Horton's relationship with Tnemec that would be evidence of a superseding contract or a new guarantee of Horton's liabilities on the old one. Trexler contends that "Lowell repeatedly told Trexler that there would be 'ample funds' from profits of the Tnemec/Horton relationship to pay the Hortoncrete litigation fees. In consideration for this promise, Trexler continued to provide legal services...." Pl. Proposed Findings of Fact p 13. Telling one's creditor how one hopes to be able to pay an acknowledged debt is not a promise of anything.
 
 
 29
 There is no reason to regard Trexler's continuing to provide services and Lowell's occasional reassurances as evidence of a new contract, rather than a continuation of performance under the old contract between Trexler and Horton and guaranteed by Lowell. Trexler undertook no new tasks after the commencement of the relationship between Horton and Tnemec, but only continued those already undertaken--handling the infringement suit and the reexamination proceeding. A contract does not become divisible into separate contracts because one party demands payment from time to time and the other party acknowledges his obligation. Blackstone continued to provide services in the hope that either the Tnemec-Horton venture would be profitable and enable Horton to pay Trexler's bill, or Horton would win a judgment or settlement against Quaker Oats. Blackstone candidly acknowledged that one of the reasons he continued to sink more time into the defense of the Patent was because if the Patent were not sustained he would probably not be paid. T. 89.
 
 
 30
 Did Lowell Have Authority To Contract On Behalf Of Tnemec?
 
 
 31
 Even if a new, separate promise to pay Trexler's bills could be found, Lowell was not authorized to make such a promise on behalf of either Tnemec or the partnership. Taking Tnemec first, Lowell had no express authority to bind Tnemec to pay Horton's bills. Cortelyou denied giving Lowell authority to bind Tnemec to pay Horton's legal bills, T. 237, Lowell denied receiving it, T. 197-98, it is contrary to the Agreement and there is no other evidence that he had it.
 
 
 32
 Although Trexler's complaint alleges only that Lowell had actual authority, Trexler's brief also argues apparent authority--that by permitting Lowell to hold himself out as the "Managing Director, Horton Division" Tnemec clothed him with apparent authority to contract for it. The facts do not support such a claim.
 
 
 33
 "Apparent authority", or "authority by estoppel," flows from the acts of a principal, and is distinguished in the case law from "implied authority," which derives from circumstantial evidence. Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf. The principal, having placed the agent in a situation where he may be presumed to have authority to act, is estopped as against the third person from denying the agent's apparent authority.
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 To prove apparent agency, one must establish: (1) the principal's consent to or knowing acquiescence in the agent's exercise of authority, (2) the third person's knowledge of the facts and good-faith belief that the agent possessed such authority, and (3) the third person's reliance on the agent's apparent authority to his or her detriment.
 
 
 37
 Northern Trust Co. v. St. Francis Hospital, 168 Ill.App.3d 270, 119 Ill.Dec. 37, 42, 522 N.E.2d 699, 704 (1st Dist.1988) (citations omitted). Whatever might have been implied in other circumstances by the assumption of the name "Tnemec Company, Horton Division," or Lowell's title as "Managing Director, Horton Division" and his use of Horton Division letterhead, the evidence shows that Blackstone did not believe that Lowell was acting for Tnemec in his dealings with him. Blackstone never attempted to collect from Tnemec before filing this suit, even though his bills remained unpaid. He continued his representation of Horton for more than two years after Tnemec entered the picture, billing Horton alone and pleading with Lowell for payment. In letters to Lowell dated March 25, 1986 and January 30, 1987 Blackstone asked Lowell to consider having Tnemec guarantee at least his future fees, indicating that he did not believe Tnemec was then responsible for Trexler's bill. Exhs. 103, 132; T. 224 (Lowell).
 
 
 38
 Furthermore, such a belief would have been unreasonable. Lowell had told Blackstone that liability for Trexler's bills would remain with Horton. Before the Agreement was signed Lowell wrote Blackstone in a letter dated November 13, 1985:
 
 
 39
 Confirming our telephone conversation of earlier today, we ... were able to reach a mutually-agreeable merger contract with Tnemec Company.
 
 
 40
 In view of the continued uncertainty of our patent, Tnemec asked that they not be held to our September 12th contract, wherein they were to purchase The Horton Company outright; but, instead, set up a joint-venture corporation.
 
 
 41
 This we finally agreed to do, and, probably by November 20, will be operating the Tnemec Company, Horton Division.
 
 
 42
 The final contract calls for The Horton Company to remain in existance [sic], retain ownership of the patent, retain obligation of [sic] to-date legal fees, and continue the legal fight.
 
 
 43
 * * *
 
 
 44
 * * *
 
 
 45
 Since The Horton Company and Tnemec will be sharing the Horton Division profits 50-50, we feel we will now have ample funds with which to timely pay your existing fees, those fees of John Synnestvedt's firm, and step up our litigation against Quaker Oats.
 
 
 46
 Exh. 104. Although there is some confusion here (how could a joint-venture corporation be a division of Tnemec?), the undisputable meaning of this letter is that Horton was retaining liability for Trexler's bill and that Lowell believed that Horton's share of the anticipated profits would provide "ample funds" to pay it.
 
 
 47
 We do not see the ambiguity that Trexler claims to see--that the possibility of "ample funds" meant that Tnemec might pay Trexler's bills directly. Lowell states that "we" will have ample funds. The "we" could refer to Horton and Tnemec but, in context, we think it meant only that both he (Horton) and Tnemec believed that Horton would have "ample funds" to pay Horton's debt. The whole statement "%[s]ince The Horton Company and Tnemec will be sharing the Horton Division profits 50-50, we feel we will now have ample funds...." If he had been suggesting that Trexler's bill would be paid from joint funds, the division of profits would be irrelevant. Also telling is Blackstone's acknowledgment that Lowell had instructed his office not to send Trexler's bills to Tnemec, Horton Division, but to Horton because Tnemec was not in any way involved in the Quaker matter. T. 97, 100, Exh. 142.
 
 
 48
 Did Lowell Have Authority To Contract On Behalf Of The Partnership?
 
 
 49
 We now turn to Lowell's authority to contract with Trexler on behalf of the partnership. By law, partners are deemed to be agents of one another with respect to the business of the partnership. Although Lowell had no authority to speak for Tnemec in retaining Trexler's services and promising to pay for them, he did speak for Horton; if an agreement to assume Horton's obligations to Trexler had been within the scope of the business of the Horton-Tnemec partnership, Lowell's word could bind Horton, which could bind the partnership, which could bind Tnemec. As we discussed in ruling on the summary judgment motion, Lowell could bind Tnemec through the partnership even if Trexler had been unaware that the partnership existed.
 
 
 50
 As stated above, we do not find evidence that Lowell entered into any new contract with Trexler on behalf of anyone. The words that Trexler points to as being a new contract, the reference to "ample funds," were used in a letter which said that Horton was to remain in existence, retain ownership of the Patent, retain the obligation for legal fees and continue the legal fight. (Although Blackstone testified that on other occasions Lowell spoke of "ample funds", T. 88, this testimony is too vague for the court to draw any conclusions from it.) Even if Lowell's acceptance of Trexler's continued services and vague assurances of payment are sufficient to affect the legal obligations of the parties, Trexler had the burden of showing that the assumption of Horton's obligation to Trexler was within the scope of the partnership business in order for Lowell to have had authority to bind the partnership. Having heard the evidence, the court finds that there can be only one conclusion: the patent litigation was intended to be, and remained, the business of Horton alone and was not within the scope of the business conducted by the partnership. Both Lowell and Cortelyou testified that it had been their intention that the Patent, the litigation (and any recovery from it) and Horton's obligations to Trexler would not be assumed by the joint venture. This is entirely consistent with the Agreement, and it is consistent with contemporaneous records of their intentions, including Lowell's letter to Blackstone quoted above. There is no evidence that Tnemec and Horton ever modified their understanding in this regard.
 
 
 51
 That Tnemec advanced money to help Horton pay past due bills and in one case to help Horton with the patent litigation does not bring the litigation within the business of the partnership. It was in Tnemec's interest that its partner remain solvent and that the Patent be upheld, but we fail to see how loaning--or giving--Horton $14,000 to assist Horton with its obligation to Trexler somehow makes Tnemec liable for the bill. If a carpenter and a mason are partners in a construction business, and the carpenter loans money to the mason to help him pay to have his truck repaired so he can get to work and finish a job, is the carpenter liable for the repair bill if the mason doesn't pay? He isn't, unless he told the repairman that he or the partnership guaranteed payment or the partners agreed that the repair bill would be a partnership obligation. Partnership is a voluntary association, and the partners can define the scope of their joint business however they please. The exception is estoppel--where a third party has been misled as to the scope of the business and hence of a partner's authority to contract on its behalf--but Trexler was not misled.
 
 
 52
 Trexler points to Tnemec's security interest in the patent, arguing that the partnership encompassed the whole operation of holding and maintaining the patent as well as marketing the product. It might have--but it didn't. Tnemec's security interest in the Patent did not convert it into partnership property. Even if the partnership owned the patent outright it would not necessarily bring the legal defense of the patent within the scope of the partnership business. There is no reason why the partners could not have assigned the Patent to the partnership, leaving to Horton the responsibility for the litigation and any recovery. Partners have a joint right of control over the partnership business. There was no evidence that Tnemec had any say in the conduct of the patent litigation, or in decisions to license the Patent outside the United States. Tnemec was concerned with the validity of the Patent, but agreed to leave ownership of the Patent, the litigation against Quaker Oats, any potential recovery and payment of Trexler's bills in Horton's hands.
 
 
 53
 If Trexler had been told by Lowell that the Patent had been assigned to the partnership, Trexler might have believed that responsibility for its fees had been assumed by the partnership, and such a belief, if reasonable, could be an element of an estoppel against the partnership. But Trexler was told that Horton retained the ownership of the Patent, it was never told that Tnemec held a security interest in the Patent and was never told the terms of the joint venture. T. 80-81. In these circumstances, it would have been unreasonable for Trexler to believe that the partnership had assumed liability for Horton's obligations.
 
 
 54
 Did The Partnership Become Liable On Horton's Existing Contract?
 
 
 55
 Trexler's final theory of recovery is that the partnership ratified, by accepting its benefits, a contract previously made between Horton and Trexler, either the contract made when Trexler was initially retained or a new contract entered into as a result of Lowell's requests for legal services following the formation of the partnership. Pl.Tr.Br. at 10, pp 9, 10; Pretrial Order at 21-22. Tnemec takes the position that no such claim was alleged in the Second Amended Complaint and therefore it should not be considered. We need not decide whether this theory was raised late since the facts brought out at trial do not support it.
 
 
 56
 Trexler's theory is elusive and does not correspond with the categories of the law. There could have been no ratification of Horton's original contract with Trexler, as ratification is normally understood. Ratification may occur where an act is performed by one person without authority for the benefit of another, or by an authorized agent in excess of his authority. Illinois Armored Car Corp. v. Industrial Comm'n, 205 Ill.App.3d 993, 150 Ill.Dec. 824, 828, 563 N.E.2d 951, 955 (1st Dist.1990). Ratification does not result from affirmance of a transaction with a third person unless the one acting as agent purported to be acting for the ratifier. Daley v. G'Sell, 102 Ill.App.3d 548, 58 Ill.Dec. 524, 527, 430 N.E.2d 556, 559 (1st Dist.1981). At the time of the original contract there was no relationship between Horton and Tnemec; Horton was not Tnemec's agent and there was no evidence that it contracted with Trexler for Tnemec's benefit.
 
 
 57
 Nor was there evidence showing the ratification of a new contract entered into after Horton became Tnemec's partner and agent. Assuming for the sake of argument that Lowell made a new contract with Trexler, ratification can only be effective when the principal has knowledge of all material facts of the transaction and the choice of accepting or rejecting its benefits. Reavy Grady & Couch Realtors v. Hall, 110 Ill.App.3d 325, 66 Ill.Dec. 35, 38 442 N.E.2d 307, 310 (4th Dist.1982). Certainly it would have a been material fact that Lowell was purporting to act for Tnemec or the partnership, rather than Horton, in contracting for Trexler's services and that Tnemec or the partnership would be expected to pay for them. There was no evidence that Tnemec was ever told that Lowell was purporting to act for the partnership in directing Trexler to continue its legal work. Nor could Tnemec have chosen not to accept the benefit. It could neither have prevented Trexler from representing Horton nor avoided whatever benefits may have been received from Trexler's efforts to uphold the Patent.[4]
 
 
 58
 As a different twist on its ratification argument, Trexler appears to argue that when Tnemec became Horton's partner it automatically assumed liability for Horton's debt to Trexler because the partnership was intended to exploit the Patent and Trexler's work therefore benefitted the partnership. The law, as stated in the very case upon which Trexler relies, Magrini v. Jackson, 17 Ill.App.2d 346, 150 N.E.2d 387 (3d Dist.1958), is to the contrary. Quoting 68 C.J.S. Partnership § 80 at 520, the court stated the rule as follows:
 
 
 59
 The individual debts of partners, whether contracted by them before the establishment of the partnership, or in establishing it, or during its existence, may be converted into firm debts, by the mutual consent of the partners, if the firm is solvent. An agreement by partners taking over the business of one of them to assume the debts of the former owner may, in the absence of an express agreement, be inferred from facts and circumstances; but an express or implied agreement is necessary to create such liability, and a person becoming a member of an existing firm, or forming a partnership with another in the latter's existing business, does not thereby automatically become liable for the debts already incurred.
 
 
 60
 Id., 150 N.E.2d at 390-91.[5] The plaintiff in Magrini had sold a restaurant (the fixtures and equipment and an assignment of the lease)--under a conditional sale contract to an individual who then went into partnership with two others to operate it. When the purchaser fell behind in his payments, the seller sued all three partners. The court found an agreement to assume the sales contract because the contract was executory, the partnership would receive the full benefit (title to the equipment and fixtures), the partnership agreement recited that the purchaser had contributed the fixtures, equipment and lease to the partnership, the agreement provided that payments on the sales contract were to be made by the partnership from partnership funds, and the partnership actually made payments on the contract in its own name. Id., 150 N.E.2d at 391-92.
 
 
 61
 The contrast with this case is obvious. There was no agreement by the partnership to recognize or assume the existing obligation. Indeed the evidence shows that Horton and Tnemec agreed that the debt to Trexler would not be assumed by the partnership. It is impossible to find an implied agreement to assume the contract with Trexler.
 
 
 62
 Trexler repeatedly insists that it conferred a benefit upon Tnemec, but fails to understand that we all benefit from other people's contracts without becoming liable on them. A tenant benefits from his landlord's contract with the roofer who repairs the roof over his head, but the tenant is not thereby bound to pay him. A patent licensee benefits from its licensor's patent, but that does not make it liable to the licensor's patent lawyer who prosecuted the patent or sustained it in court. We made this point in granting Tnemec's motion for summary judgment on Count III, citing Goldstick v. ICM Realty, 788 F.2d 456, 467 (7th Cir.1986), to the same effect, but Trexler has ignored it.
 
 
 63
 It is unfortunate that Trexler was left out when Tnemec loaned Horton the money to pay its other creditors--a loan Tnemec probably realized would not be repaid. We have no way of knowing how many of Horton's creditors had claims against the partnership for which Tnemec would have been liable, but Tnemec was not required to extend its generosity to Trexler and add almost $200,000 to the $600,000 it had already lost. Trexler knew that when it undertook expensive litigation on behalf of a small business with a promising patent it took a risk that it might not be paid. Tnemec took its own risk and paid for it; it did not agree to assume Trexler's.
 
 Conclusion
 
 64
 Final judgment will be entered for Tnemec on Trexler's claims against Tnemec. Because Horton has not consented to entry of judgment by a Magistrate Judge, this action cannot be dismissed until Judge Plunkett rules. However, the court determines that there is no just reason for delay and directs that final judgment for Tnemec be entered under Rule 54(b) Fed.R.Civ.P.
 
 ENTER:
 
 65
 /s/ Bernard Weisberg
 
 Bernard Weisberg
 United States Magistrate Judge
 DATE: September 4, 1992
 
 66
 cc:All Attorneys of Record
 
 
 67
 (See Attached Service List)
 
 
 
 *
 Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 Tnemec is "cement" spelled backwards
 
 
 [2]
 Trexler is an Illinois professional corporation having its principal place of business in Illinois. Horton is a Florida corporation having its principal place of business in Florida. Lowell Horton is also a citizen of Florida. Tnemec is a Missouri corporation having its principal place of business in Missouri. There is complete diversity of citizenship and the amount in controversy exceeds $10,000 (the jurisdictional minimum at the time of filing)
 
 
 [3]
 Because the remaining defendant Horton has not filed a consent this court has no authority to enter judgment against it. We recommend in a separate order entered today that Judge Plunkett dismiss the suit against Horton on the alternative grounds of want of prosecution or failure to effect service within 120 days pursuant to Rule 4(j), Fed.R.Civ.P. We noted in our February 28, 1991 ruling on both parties' summary judgment motions that Horton had not been served. Trexler has made no subsequent attempt to serve Horton or indicated any interest in pursuing it. Trexler has had adequate notice
 
 
 [4]
 Of course, ratification could only be by Tnemec. Lowell could not, through Horton (which he controlled), ratify his own unauthorized conduct on behalf of the partnership
 
 
 [5]
 Trexler's brief at 11 n. 41 states that Magrini involves the assumption by a partnership of an opera singer's contract. It does not. The opinion does discuss Hoffman v. Stewart, 184 Ill.App. 66, which held that when one partner had an executory contract with a prima donna and a theater lease and formed an opera company in partnership with two other men, the partners were liable for her salary. Magrini quoted Hoffman's holding that there was an exception to the rule that incoming partners are not liable for existing debts. When a contract remains executory until a new partner is admitted and and the incoming contract is adopted by the new partner who acquires the same benefit as if he had been a partner in the original transaction, a promise to assume the liability may be implied. Magrini, 150 N.E.2d at 391