RESPECT INCORPORATED and
Coleen Mast, Plaintiffs,

v.

COMMITTEE ON THE STATUS
OF WOMEN, d/b/a Project
Respect, Defendant.

No. 90 C 3770.

United States District Court,
N.D. Illinois, E.D.

Jan. 2, 1992.

Daniel F. O'Connell, Mauck, Bellande, Baker & O'Connell, Chicago, Ill., Neil F. Markva, Springfield, Va., Richard Allyn Shaffer, Westport, Conn., for plaintiffs.

James J. Hamill, Timothy Levstik, Fitch, Even, Tabin & Flannery, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Coleen Mast ("Mast") and Respect Incorporated (together referred to as "Respect,"[1] treated after this sentence as though it were a singular collective noun) have filed an eight-count Complaint against Committee on the Status of Women ("Committee"). Respect claims a host of violations of its rights: copyright infringement (Count I), service mark/trademark infringement (Count II), breach of contract (Count III), common-law unfair competition (Count IV), violations of Lanham Act § 43(a) (Count V), conversion (Count VI)

---

[1]. Respect Incorporated is the corporate entity through which Mast and her husband Kent conduct what appears to be a small family-owned business. Mast was previously, and Kent now is, president of the corporation, while Mast is now its secretary (Mast Dep. 12–13). No legal distinction is intended where this opinion refers to Mast as an individual rather than to Respect, for the individual and corporate interests appear identical.

and fraud in the inducement of a contract (Count VII). Respect seeks an accounting as well (Count VIII).

Committee has now moved under Fed. R.Civ.P. ("Rule") 56 to obtain a partial summary judgment dismissing Counts III and VI. Even though the parties' submissions range far beyond the limited scope of that motion, instead addressing all aspects of the parties' relationship in global terms, this Court will—like the good shoemaker—stick to its last. For the reasons stated in this memorandum opinion and order, Committee's motion is granted as to both counts.

*Facts* [2]

■ This District Court's General Rule ("GR") 12(m) requires the Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each fact alleged. GR 12(n) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Facts must be deemed uncontested if the responding party does not cite supporting documentation for any objections to the movant's version—a rule that is strictly enforced (*Maksym v. Loesch*, 937 F.2d 1237, 1240–41 (7th Cir.1991) and cases cited there)).

What follows is a quick overview of the facts as developed under GR 12. Additional facts are elucidated as necessary in the later text discussion.[3]

Sexual abstinence education, a novel component of school curricula across the United States, provides the backdrop for this lawsuit. Respect developed a program called "Sex Respect" ("the program") designed to promote abstinence among schoolchildren. One component of the program was a set of three books entitled *Sex Respect: The Option of True Sexual Freedom:* a teacher's manual, a parent's manual and a student workbook ("the books"). Committee obtained federal funds from the United States Department of Health and Human Services ("HHS") to carry out a pilot expansion of the program in selected public schools in Illinois.

Committee and Respect now disagree over the legal nature of their business relationship. Committee maintains that Mast was its employee, not its consultant; that *Sex Respect* was a work for hire in which Respect retained no rights; that under HHS regulations Committee was free to produce its own copies of the program materials notwithstanding Respect's assertion of copyright; and that Committee never entered into a binding contract to buy books from Respect. On each of those points Respect contends the converse: that Mast was an independent consultant; that Respect retained certain rights in the books and the program; that the use of HHS funds did not erase Respect's rights in the program and books; and that Respect and Committee entered into a binding and far-reaching contract governing the development of both the books and the program.

Things turned sour at some point. Committee produced and distributed copies of the books without getting Respect's permission or paying Respect any compensation. Respect then brought this lawsuit.

**2.** Familiar Rule 56 principles impose on the movant—in this case Committee—the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Respect (*De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Of course, a motion for partial summary judgment typically tenders only a partial set of facts—those necessary to decide the limited issues presented by the motion. Hence this opinion does not involve a comprehensive description of all the facts in the case, and those facts it does treat with are (where appropriate) skewed in Respect's favor. For those reasons this Court's (or a jury's) future treatment of the case might very well find the facts differently, in addition to fleshing out the case with further facts.

**3.** Committee's GR 12(m) statement will be cited "D. 12(m) ¶ —" in this opinion, while Respect's GR 12(n) response will be cited "P. 12(n) ¶ —."

## Rule 56 Principles

 Rule 56 requires this Court to rule in the movant's favor if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." To demonstrate that an issue is "genuine," the moving party must cite to evidence in the record sufficient to suggest that its view of the issue might be adopted by a reasonable factfinder (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1304 (7th Cir.1991)). To demonstrate that an issue is "material," the moving party must show that the issue is outcome-determinative under the applicable substantive law (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)).

## Respect's Contract Claim

Mast developed the initial version of the Sex Respect program and taught it for several years before entering into negotiations with Committee (P.Ex. 10 (hereafter cited "Mast Aff.") ¶ 1; P.Ex. 8 at 2). Evidently Mast wanted to upgrade the quality of her teaching materials and to disseminate them more widely. It is not clear just when Committee entered the picture,[4] but by early 1985 Committee advised Mast that federal funds might be available to test or expand the program in public schools. Committee's President Kathleen Sullivan introduced Mast to Douglas Hofmeister, the head of a publishing company called United Communications of America, Inc. ("UCA"), to see whether Mast could arrange to have her teaching materials reproduced commercially (Mast Aff. ¶ 4).[5]

On July 29, 1985 Mast entered into a publishing contract with UCA (P.Ex. 2)[6] under which UCA agreed to publish three books related to the program: the workbook, a teacher handbook and a parent handbook. Under the contract Mast assigned to UCA the sole right to publish the three works, as well as assigning the copyrights themselves. She began writing the books in August 1985 (Mast Aff. ¶ 9).[7]

On October 15, 1985, at a meeting attended by Mast and members of Committee, the parties allegedly entered into a comprehensive oral contract. Mast Aff. ¶ 13 offers a 15-point recitation of the contract provisions, but the essence of the agreement is more briefly summarized in these terms:

1. Committee agreed to conduct a pilot program to test the effectiveness of Sex Respect by teaching the program in selected public schools (Mast Aff. ¶ 13(a)). Committee also agreed to conduct several detailed evaluations of the pilot program and to provide those evaluations to Mast (*id.* ¶ 13(j)–13(o)).

---

4. In its brief, and without adducing the documentary evidence necessary to support a finding of fact under Rule 56, Respect claims that noted chastity activist Phyllis Schlafly saw Mast make a Sex Respect presentation in the spring of 1985, urged her to apply for a federal grant to expand the program, and personally "resurrected" the dormant Committee to provide a legal entity through which Mast could obtain such funds (P.Mem. 6). Those unsupported assertions, which are wholly beside the mark (because truly irrelevant) on the current motion, will simply be ignored by this Court.

5. Committee was not a party to the publishing contract, and its role in bringing Mast and UCA together appears irrelevant to the case.

6. Mast Aff. ¶ 6 refers to a single "publishing agreement" with UCA that covered all three books, while in the complaint for rescission that she later filed against UCA in the Circuit Court of Kankakee County Mast referred to executing "three instruments" with UCA (P.Ex. 5 ¶ 3). Because the only contract document now in the record (P.Ex. 2) is a form contract for the publication of one book, this opinion will assume that Mast and UCA entered into three identical form contracts that really functioned as one. Nothing would flow from any variant on that hypothesis anyway.

7. Committee alleges that Mast was only a co-author of the books (D. Counterclaim ¶ 17), and it further alleges that Mast infringed copyrights held by Committee (*id.* ¶ 38). It is not necessary to resolve those disputes to decide the current motions (and Rule 56(e) does not allow this Court to credit Committee's mere pleading allegations anyway), so this opinion will not discuss them further. Relatedly, wherever this opinion later refers to Committee's pleadings rather than to its evidentiary submissions on the current motion, those references are purely informational for narrative purposes—the pleading allegations are *not* being credited in resolving the Rule 56 issues.

2. Committee further agreed to buy all its books for the pilot program from UCA—a source of revenue for Mast, because under her contract with UCA she was guaranteed royalties (P.Ex. 2 ¶ V). That commitment by Committee was to last three years. Price, quantity and time of delivery were not settled at the meeting because the parties did not have enough information to establish those terms.

3. Mast agreed to act as a part-time consultant to Committee, providing it with professional services required to carry out the pilot program—including teacher training, curriculum development and liaison services with the pilot schools—in exchange for an annual $20,-000 fee plus clerical expenses.

Committee denies that it ever entered into such a comprehensive oral contract. It specifically denies making a blanket agreement to buy all its *Sex Respect* books from Mast or her publisher (Amended Answer ¶ 37). On the other hand, Committee repeatedly contends that Mast was its employee rather than an independent consultant (see, e.g., D.Mem. 3–4), thus conceding that it entered into a personal services contract with Mast at some point.[8]

Mast delivered manuscripts to UCA, which began producing books. In the fall of 1985 Committee placed an order with UCA for over 3,000 books (P.Ex. 3). Mast claims that purchase was in fulfillment of Committee's contractual obligation. Committee contends that it bought the books from UCA only "[t]o insure Mast's cooperation and continued support in teaching, promoting and introducing the books into schools" (D.Mem. 5 n. 7).

Later Mast and UCA had a falling-out that led to separate litigation unrelated to this case. As a result of that litigation Mast regained control over her manuscripts, assigned the copyrights to Respect and made independent arrangements to publish the books. Mast contends that in January 1986 she and Committee orally amended their contract to substitute Respect for UCA as the entity from which Committee would buy all its books (Mast Aff. ¶ 29). In the same month Committee ordered books directly from Respect, and Respect filled the order (P.Ex. 4). Committee later placed other such orders—a letter from Kent Mast to Kathleen Sullivan dated April 27, 1987 refers to *"continued* orders [from Committee to Respect] for SEX RESPECT materials" (D.Ex. 1, emphasis added), and Committee admits that it bought books from Respect "from time to time" (Amended Answer ¶ 79)—but the record does not establish the details of all such orders.

In the spring of 1987 Committee ordered more books from Respect, and a dispute arose over price (D.Ex. 1). Rather than pay the higher price requested by Respect, Committee arranged to have new books printed through Park & Montgomery Advertising (D.Ex. 2). In the wake of that decision the relationship between Committee and Mast appears to have broken down completely, and this lawsuit is the result of the breakdown.

Respect's breach of contract claim makes two essential allegations. First, it says that Committee failed adequately to test the effectiveness of the Sex Respect program and that it never communicated the results of the pilot study to Mast (Complaint ¶ 38). As relief Respect demands specific performance (though not by name): It asks that this Court order Committee to turn over all data and documents pertinent to the evaluation of the pilot program (*id.* ¶ 40). Second, Respect claims that by asserting control over the program and teaching materials Committee caused Mast "detriment, humiliation, damage, loss of reputation and loss of profit" (*id.* ¶ 38). As relief Respect demands actual damages, costs and fees (*id.* ¶¶ 41–42).

---

**8.** By referring here and in the next paragraph to Committee's pleadings and brief, this opinion seeks only to stitch together a coherent narrative. As stated in n. 7, this Court does not credit them as evidence, which Rule 56 would forbid.

Most importantly in Rule 56 terms, as noted later in the text, this opinion ultimately accepts Respect's view of the contract for purposes of the current motion.

Resolution of all factual disputes in Mast's favor demands that this Court accept her version (as set out in Mast Aff. ¶ 13) that the parties in fact intended to enter into a binding contract for both goods and services, as described earlier. Again granting Respect the benefit of the doubt, this Court will also assume that the parties intended that Committee buy all its books from UCA or, after the January 1986 amendment, from Respect.

Thus far all that has been established is that Committee broke some promises. But not every broken promise creates a cause of action: Committee contends that its agreement with Mast was unenforceable as a matter of law, and if that is so then summary judgment in Committee's favor is in order.

Committee does not deny that it had some sort of agreement with Mast—how could it, if it wants to argue that Mast was its employee?—but it urges that the particular oral contract alleged by Mast is unenforceable because essential terms were left open at the time of contract formation. Mast admits that certain terms were not defined either on October 15, 1985 or at the time of the January 1986 amendment: more specifically, the price, delivery date and quantity of books were left open, and the format, nature and delivery date of the evaluations were not resolved either (P. 12(n) ¶ 7).

■ It is undisputed that the agreement, whatever its content, was oral. To be sure, some documents most likely exist that support the existence of the contract.[9] But even if such documents do exist and are construed as part of the contract—and the contract is thus found to be partly written and partly oral—then the law governing oral contracts still applies (*Toth v. Mansell*, 207 Ill.App.3d 665, 671, 152 Ill.Dec. 853, 857, 566 N.E.2d 730, 734 (1st Dist.1991)).

Under Illinois' version of the Statute of Frauds an oral contract is unenforceable unless by its terms it is capable of full performance within one year, as measured from the date of its making (Ill.Rev.Stat. ch. 59, ¶ 1; see also *Sherwin v. Ault*, 219 Ill.App.3d 213, 161 Ill.Dec. 877, 878, 579 N.E.2d 425, 426 (Ill.App.3d Dist.1991)). By Mast's admission the pilot program was to run for more than one year: Mast Aff. ¶ 13(h) says that Committee promised to buy books over a three-year period, the duration of the pilot study. Hence the contract is unenforceable.

Surely Mast cannot and does not contend (for she offers no evidence tending to prove) that the parties intended to conclude performance of the contract—including curriculum development, selection of schools, training, classroom teaching and evaluation—within 12 months. Even if measured by the date of the January 1986 amendment rather than the October 15, 1985 contract, such a claim would be incredible. Mast's best chance to characterize the relationship as a one-year contract within the meaning of the Statute of Frauds would be to frame it as one in which the parties intended that Mast would *provide services* year by year on a renewable basis, as suggested by Mast Aff. ¶ 13(d). But even on such a Procrustean effort to reshape the contract to fit the legal standard, that reshaped contract must also fail.

■ For this was a *mixed* contract, involving both the provision of goods and the rendering of services. Respect agrees with that characterization but then argues that "[a]s to the portion of the contract dealing with goods, Article 2 of the Uniform Commercial Code governs" (P.Amendment to Mem. at 3). That assertion misreads the law: Instead the cases governing such mixed contracts require this Court to determine whether the "predominant purpose, or 'raison d'etre'" of the contract was pri-

---

**9.** It would be surprising, for instance, if the parties never signed any piece of paper evidencing Mast's agreement to work with Committee (though no such document is now in the record). Similarly, the record does contain documentation of particular book orders placed by Committee with UCA and with Respect. Such orders might conceivably be construed (though this is stretching the point) as evidence of a larger agreement requiring Committee to place orders as Respect contends.

marily the provision of goods or the rendition of services (*Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1153–54 (7th Cir.1989) (citation omitted)). If the contract is predominantly for goods, then the entire contract falls within the ambit of UCC Article 2 (*id.* at 1153). If it is primarily a contract for services, then the entire contract must be tested by common-law standards (see, e.g., *Executive Centers of America, Inc. v. Bannon*, 62 Ill.App.3d 738, 19 Ill.Dec. 700, 379 N.E.2d 364 (3d Dist.1978)).

▆▆▆▆ This choice-of-law question (in the substantive law sense) is crucial here, for under the UCC a contract lacking essential terms may under some circumstances be enforceable (*Goldstick v. ICM Realty*, 788 F.2d 456, 461 (7th Cir.1986), citing UCC § 2–305). In that respect the UCC modifies the common law (*id.* at 461), because at common law a contract lacking essential terms is void for uncertainty (*Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 30, 161 Ill.Dec. 335, 338, 578 N.E.2d 981, 984 (1991) (applying that principle to a book-publishing contract)). Whether a term is "essential" may vary according to the details of a particular agreement (*Delcon Group, Inc. v. Northern Trust Corp.*, 187 Ill.App.3d 635, 135 Ill.Dec. 212, 543 N.E.2d 595 (2d Dist.1989)). But price, delivery date and quantity are generally thought to be "essential" as a matter of law in all common-law contracts, and courts therefore refuse to supply those terms where the parties have not (*Goldstick*, 788 F.2d at 461–62; *Academy Chicago*, 144 Ill.2d at 29–30, 161 Ill.Dec. at 338, 578 N.E.2d at 984).

There is no hard-and-fast rule for determining the predominant purpose of a mixed contract. Research reveals "a welter of cases reaching varying results depending on the considerations deemed to predominate in each particular case" (*Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 459–60 & nn. 11–14 (4th Cir.1983) (collecting cases)).

Probably the most nearly legally comparable situation to this case is found in *Executive Centers*, where defendant had signed a contract to work as the golf professional at plaintiff's country club. In the same contract defendant agreed to purchase 20 used golf carts from plaintiff, who agreed in turn to repurchase them upon cancellation of defendant's employment. Litigation arose when the parties could not agree on the repurchase price, and defendant argued that UCC Article 2 supplied the rules of decision. But the court found that the purpose of the contract was the rendition of services, so that the common law controlled. Among the "many [contract] terms concerning the various duties and obligations of both parties to the agreement," the required purchase and repurchase of the golf carts was "[i]ncidental." 62 Ill.App.3d at 742, 19 Ill.Dec. at 702, 379 N.E.2d at 366.

▆▆▆ While those facts do not track the situation here closely,[10] the approach taken in *Executive Centers* strongly suggests that Mast's agreement with Committee was predominantly a service contract. Mast herself characterizes the parties' agreement (Mast Aff. ¶ 13) much as the court characterized the contract in *Executive Centers*: as a collection of many terms related primarily to the rendition of services, with the book purchases serving as one part of the total deal—but certainly not as the heart of the agreement. Throughout Mast's filings before this Court there is an overarching theme that Sex Respect is a holistic *program*, not just a handful of books (see, e.g., P.Mem. 1–2). Mast's role as consultant to Committee was meant to be similarly holistic (*id.* at 12–13). Mast can hardly argue in good faith that her contract with Committee—which she says required her to play various essential roles in the pilot expansion of Sex Respect—was primarily just a contract for the sale of books with a few personal service obli-

---

**10.** *Executive Centers* involved a written contract, for instance, and the court gave some weight to the specific language of the contract (62 Ill.App.3d at 742, 19 Ill.Dec. at 702–03, 379 N.E.2d at 366–67). While there is no written contract in this case, the difference is meaningless: If there were a written contract that tracked Mast's allegations, the result would be the same.

gations thrown in. This Court will not adopt a view of the contract so plainly contrary to Mast's own view, and so plainly contrary to the closest authority on point.

Indeed, the final nail in Respect's coffin on this issue is driven by the recollection that the contract *must* be labeled as one for Mast's services if it is to survive the Statute of Frauds requirement that it be capable of performance in less than a year. Respect cannot have it that way for one purpose, then shift the contract's dominant purpose to the sale of goods (which would fail the Statute of Frauds test) when it suits Respect's other goal of avoiding invalidity because of uncertainty. For Respect it comes down to a choice (to shift metaphors from land to sea) between Scylla and Charybdis rather than any possibility of steering between those perils—either way, its contractual ship sinks.

■ In light of the required determination that the parties' contract was predominantly one for services, common law principles apply. Under those principles the contract is so permeated with undefined essential terms that this Court cannot enforce it.

*Respect's Conversion Claim*

Respect claims that Committee, or a printing company acting as Committee's agent,[11] converted to its own use the original plates used to print the books. Respect charges that Committee produced the unauthorized copies of the books by using those plates, while Committee contends that it made new plates of its own by photographing the books and making new plates from the photographs (Susan Fremgen Decl. ¶ 11). That contention would of course be no defense to the charge that

Committee violated Respect's intellectual property rights in the books. But if true it would be a complete defense to the charge of conversion, which is an offense against tangible property.

■ Conversion has four elements under Illinois law: (1) defendant's unauthorized and wrongful assertion of ownership, dominion or control over property; (2) plaintiff's right in the property; (3) plaintiff's right to immediate possession of the property; and (4) plaintiff's demand for its possession (*Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1060 (7th Cir.1988)). For present purposes Committee seems to concede elements 2, 3 and 4. Instead Committee directs its fire at the alleged lack of proof on element 1: whether Committee ever took control of the plates.

■ No eyewitness testimony, no documentary evidence and no admissions support Respect's claim that Committee or its agent took control of the plates. At her deposition Mast admitted that she had no personal knowledge of any facts that supported her conversion claim (Mast Dep. 11–12; D. 12(n) ¶ 6). In fact, the printer who produced the Committee version of the books swears that she saw (and left) the original plates in the dumpster of the original printer (Susan Fremgen Decl. ¶ 6). Respect offers no evidence to controvert that testimony, and this Court therefore must accept it as fact.[12]

In support of its theory that Committee somehow retrieved the plates and made use of them, Respect offers only the affidavit of Mark Gravlin ("Gravlin"), a printing executive serving as an expert witness.

---

**11.** Committee denies the existence of an agency relationship between it and the printer. For present purposes this opinion simply assumes (without expressly holding) that an agency relationship did exist.

**12.** Here it is important to note the scope of this opinion's treatment of the conversion claim. Respect's Complaint ¶ 65, though vaguely worded, appears to allege conversion of the plates for all three *Sex Respect* books (student, teacher, and parent). Committee's denial (see the Susan Fremgen declaration) likewise appears to encompass all three books. Because Respect has

left that denial wholly unrebutted as to the parent and teacher books, the conversion claim as to those books must be dismissed for Respect's failure to create any issue of fact whatever. This opinion's further discussion focuses only on the alleged conversion of plates for the student workbook, as to which Respect has offered some evidence (see the later text discussion of the Gravlin Affidavit). Perhaps Respect intended that evidence to apply to the other two books as well, but no matter—the result would be the same.

Gravlin compared a copy of the Committee version of the student workbook with a copy of the Respect version. He opines that the two versions must have been printed from the same original plates (Gravlin Aff. ¶ 12) because the books contain the same minuscule characteristics—features so fine that they could not have been transmitted through the photographic reproduction process that Committee claims to have used. Gravlin cites three assertedly telltale examples of such fingerprints, all from page 25 of the workbook:

—Both versions use the same photograph of a crowd scene at the Taste of Chicago festival. Each version has "almost identical resolution and contrast" (Gravlin Aff. ¶ 13).

—In the tiny numeral "8" that signals footnote 8, the loops at the top and bottom of the numeral are "not quite close[d]" in both versions (*id.* ¶ 14).

—In a lower-case letter "t," the half-loop at the bottom of the letter is broken off in both versions (*id.* ¶ 15).

Gravlin does not purport to offer a comprehensive analysis of the two books but states that other, similar examples not discussed in the affidavit lend further support to his conclusion (*id.* ¶ 16). Presumably Gravlin could testify to those other examples at trial. Respect contends that the Gravlin Affidavit alone creates a genuine issue of material fact—that a reasonable factfinder relying solely on Gravlin's testimony could find by a preponderance of the evidence that Committee took control of Respect's plates.[13]

Committee responds that the Gravlin Affidavit, which focuses exclusively on *similarities* between the two versions, ignores stark *differences* between the two (D.Mem. in Response to Gravlin Declaration at 2–3).[14] Committee's memorandum cites three such differences:

—On page 25, in the same Taste of Chicago photograph that Gravlin discusses, the Respect version is cropped at the lower left to include part of a letter in a sign (apparently the top right edge of a capital "T") and is cropped at the top center to include the top of a Miller Beer sign. In the Committee version the photograph is cropped to exclude the edge of the "T" and the top of the Miller sign.

—Page 31 of both versions have the same text, layout and headline: "Be Confident, Be a Virgin." Above that headline in the Respect version there appears a photograph of a confident young woman with short medium-brown hair, wearing a plaid shirt knotted at the waist and carrying a dark jacket slung over her shoulder. Committee's version is illustrated by a photograph of an entirely different woman who looks equally confident but has long blond hair, a dark solid-color blouse and a white jacket slung over her shoulder.

—Page 48 of both versions is illustrated by the same photograph of father, mother and toddler laughing together. Mother, seated in profile at the far right, wears a sleeveless sweater over a long-sleeved shirt. In the Respect version the photograph is cropped at the edge of mother's armpit. In the Committee version it is cropped further to the right, so that a few inches of the sweater behind mother's armpit are clearly visible.

---

**13.** To the extent that Respect's argument goes beyond the specific examples adduced by Gravlin to his generalized assertion that other examples could be given to buttress his conclusion, that may stretch the "reasonable inferences" doctrine under Rule 56 (see n. 2) past the breaking point. It is at least doubtful that an expert testifying from the witness stand—the proper test for a Rule 56(e) affidavit—would be permitted to cite three items in support of a hypothesis and then say simply, "There are other examples too, but I won't mention them."

**14.** Committee responded to the Gravlin Affidavit with a short brief signed by counsel (who offers no evidence of his own printing expertise) pointing out the discrepancies between the two versions. Of course a brief is not evidence (see, e.g., *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)), so that in evidentiary terms the contest is between the Susan Fremgen declaration that Respect's original plates were *not* taken (coupled of course with the physical evidence of the books themselves) and Gravlin's assertion that the plates must have been taken. But as the following text discussion demonstrates, that becomes no contest because the Gravlin version is not to be credited.

Could a reasonable factfinder rule for Respect on its conversion claim on the sole basis of Gravlin's opinion? That question can only be answered "no," for the Gravlin Affidavit is so completely undercut by Committee's response that it could not support a finding by a preponderance of the evidence that Committee used Respect's plates. One need not be an expert on printing technology to know that the same plate cannot produce a page with different photographs, and there is no hint that Respect's plates were somehow altered by cutting out sections and replacing them with other sections of different plates so as to substitute one photograph for another or to substitute a differently cropped version of the same photograph. Indeed, even if such a surgical job were possible (and Respect does not even urge that alternative), what in the world would induce its use when other means such as that Committee says it employed are so easy to follow? All that can really be extracted from Gravlin's affidavit is that he looked at one page (or more than one page) of the workbook and spotted a few similarities that seemed significant to him. Gravlin did not notice, or chose not to mention, significant differences that demolish his conclusion.

 Ordinarily, of course, a district court is not to evaluate the credibility or persuasiveness of evidence at the summary judgment stage—a point that this Court has repeatedly stressed in its own opinions (see, e.g., *United States v. Kitsos*, 770 F.Supp. 1230, 1237 (N.D.Ill.1991)). "But a court is not required to stand helpless just because a litigant tenders something that *purports* to create a disputed factual issue" (*id.*, emphasis in original). Evidence that "is merely colorable or is not significantly probative" does not foreclose summary judgment (*Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citation omitted)), and even on summary judgment the district court should not credit testimony that is inherently incredible (*Simms v. Reiner*, 419 F.Supp. 468, 475 (N.D.Ill. 1976))—a standard met where, as here, the nonmoving party's story is "irrefutably contradicted by documentary evidence"

(*Stewart v. RCA Corp.*, 790 F.2d 624, 628 (7th Cir.1986)).

Patent law supplies a useful analogy. In patent cases—which generally turn on technical disputes not easily resolved by a lay trier of fact—it is well-settled that conflicts over the reliability of expert testimony are generally best resolved at trial, and not on summary judgment (*Landau v. J.D. Barter Constr. Co.*, 657 F.2d 158, 161–62 (7th Cir.1981)). But an exception to that rule is made where the issues, though technical, are so obviously understandable to a layperson that an issue is "not materially in dispute" even though expert testimony is offered (*Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.1982)).

 For the reasons just discussed, Respect's conversion claim must be said to fall within the scope of a parallel exception. Only a brief visual examination of the two versions is required to see beyond question that different plates were used. Gravlin's affidavit falls of its own weight, and Respect is left with nothing to counter Committee's denials and Susan Fremgen's express refutation of any conversion of the plates. There is nothing to submit to a jury, or for this Court to consider if it were to be the factfinder, to resolve what turns out to be a total nonissue.

### Conclusion

No genuine issue of material fact exists as to either the contract claim or the conversion claim, and Committee is entitled to a judgment on each claim as a matter of law. Both Count III and Count VI are dismissed. Counsel for the parties are directed to appear before this Court at 8:45 a.m. January 10, 1992 for a status hearing on the future course of this action.