**MIDWEST MANUFACTURING HOLDING, L.L.C., and I.P. Acquisition, L.L.C., Plaintiffs,**

v.

**DONNELLY CORPORATION, Donnelly Technology, Inc., and Don–Tech, Inc.,**

No. 97 C 0638.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 28, 1997.

Chicago, IL,, Richard A. Kay, Jon M. Bylsma, Terrance R. Bacon, Jeffrey R. Hughes, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court are defendant Donnelly Corporation's ("Donnelly"), Donnelly Technology, Inc.'s ("Donnelly Tech"), and Don–Tech, Inc.'s ("Don–Tech") (collectively, "defendants") motion to dismiss plaintiff Midwest Manufacturing Holding, L.L.C.'s ("Midwest"), and I.P. Acquisition, L.L.C.'s ("I.P.Acquisition"), (collectively, "plaintiffs") complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, the court grants in part and denies in part defendants' motion.

### I.  BACKGROUND [1]

Midwest is a leading manufacturer of heat reflective glass used in commercial and residential appliances throughout the United States. I.P. Acquisition, a wholly owned subsidiary of Midwest, was created for the specific purpose of acquiring Donnelly's Information Products Division ("I.P.business").

Donnelly is a manufacturer of automobile glass for the domestic and international automobile industry and has over 24 manufacturing facilities worldwide. Donnelly's I.P. business is the only supplier of bent, coated glass used in touch screen monitors in the United States, and possesses trade secrets, patents, and technology in relation to bent glass and glass coating. Donnelly Technology, a wholly owned subsidiary of Donnelly, possesses certain intellectual property rights related to this technology. Don–Tech, also a wholly owned subsidiary of Donnelly, was created to hold the assets of the I.P. business pending the sale of the I.P. business to Midwest.

In early 1996, Midwest began negotiating with Donnelly for the acquisition of its I.P. business, which possesses numerous patents, trade secrets, technology, and operating knowledge regarding bent glass and the

Thomas Otman Kuhns, Timothy A. Duffy, Maria R. Ticsay, Kirkland & Ellis, Chicago, IL, for plaintiffs.

Leland W. Hutchinson, Jr., Fred L. Foreman, David A. Rammelt, Freeborn & Peters,

1.  The facts are taken from the amended complaint.

glass industry generally. The parties entered a confidentiality agreement in April 1996.

On October 28, 1996, the parties signed their final letter of intent. The terms, which were subject to modification, included that: (1) Midwest would acquire substantially all of the assets of the I.P. business, except for real estate and the "E–Beam Coater;" (2) the parties would share, pursuant to an agreement, the "E–Beam Coater" and "Glass Bender No. 1;" (3) the purchase price would be $10,750,000; (4) Donnelly would lease to Midwest approximately 85,000 to 90,000 square feet of Donnelly's facility; and (5) Midwest would offer employment to Donnelly's employees while Donnelly would use its best efforts to arrange that employees of the I.P. business who wanted to remain Donnelly employees would be leased to Donnelly under an agreement.

The letter of intent was subject to the approval of Midwest's and Donnelly's boards of directors. The letter of intent also called for the parties to execute a definitive agreement by December 15, 1996, and provided that if such an agreement were not executed by then, the letter of intent would terminate and the transaction be deemed abandoned.

On December 6, 1996, the Donnelly board of directors approved a resolution that approved the sale of the I.P. business to Midwest under the terms of the October 28, 1996, letter of intent. The resolution authorized William Jellison, Donnelly's chief financial officer, and Dwane Baumgardner, Donnelly's chairman and chief executive officer, to continue negotiations on behalf of Donnelly and to execute documents necessary to consummate the sale of the I.P. business's assets.

Although the parties failed to reach an agreement by December 15, 1996, the parties continued to negotiate towards a final agreement, with the same essential terms as in the letter of intent and with Jellison negotiating directly with Midwest on Donnelly's behalf. On January 14, 1997, counsel for Donnelly and Midwest jointly authored a memorandum detailing the still open issues regarding the specific terms of agreement.

On January 17, 1997, Jellison and lead outside counsel for Donnelly conducted a conference call with Midwest representative Robert Perille. During the call, Jellison agreed that all the open issues had been resolved and that Donnelly would sell the I.P. business to Midwest. The closing on the sale was to take place during meetings on January 20, 21, and 22, 1997.

During this phone conversation, Jellison told Perille that he agreed to all the essential terms of the underlying transaction on Donnelly's behalf; that any further approval of the terms of the underlying transaction by Donnelly personnel had been secured or would be secured without difficulty; and that Donnelly would consummate the transaction during a closing to take place in Chicago on the foregoing dates. At the conclusion of the conversation, it was Midwest's understanding that the closing would take place on the foregoing dates, that Jellison had executed the necessary documents, and that all that was necessary to complete the sale was Jellison's verbal authorization.

The parties' agreement as of January 17, 1997, was reflected in a contract consisting of seven agreements. The Asset Purchase Agreement contained the parties' mutual intent and understanding regarding the purchase and sale of assets; manner of payment; representations and warranties; closing; and miscellaneous other issues. The Technology Transfer and License Agreement governed the transfer and licensing of intellectual property rights associated with the acquisition. The Employee Leasing Agreement provided for the retention of certain Donnelly employees after the acquisition. The Transition Services and Consulting Agreement provided for the immediate and transitional administrative, MIS, purchasing, and accounting services to be provided by Donnelly. The Sharing Agreement provided for the immediate sharing of common space, materials, and equipment. The Environmental Agreement provided for certain environmental liability indemnifications for the I.P. business's manufacturing facility. The Long Term Lease Agreement provided for a 10–year lease, with a five-year option, of Donnelly's manufacturing facility.

On January 19, 1997, Baumgardner made a presentation to Donnelly's board of directors and recommended that Donnelly not sell the I.P. business to Midwest. The board agreed. Consequently, on the evening before the scheduled closing, Jellison contacted Midwest's negotiators and informed them that Donnelly would not sell the I.P. business as planned and would not proceed with the January 20 closing.

Plaintiffs sued defendants in state court, alleging breach of contract (Count I), promissory estoppel (Count II), and breach of implied covenant of good faith and fair dealing (Count III). Defendants removed the action to this court. After removal, plaintiffs filed an amended complaint, alleging breach of contract (Count I), breach of duty to negotiate in good faith (Count II), and promissory estoppel (Count III). Defendants now move to dismiss all counts of the amended complaint for failure to state a claim.

## II. *DISCUSSION*

### A. *Standard for deciding a motion to dismiss*

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Ellsworth v. City of Racine,* 774 F.2d 182. 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). The court may take into consideration documents incorporated by reference to the pleadings. *United States v. Wood,* 925 F.2d 1580, 1581 (7th Cir.1991); *see also* FED. R. CIV. P. 10(c). If, when viewed in the light most favorable to the plaintiff, the complaint fails to state a claim upon which relief can be granted, the court must dismiss the case. *See* FED. R. CIV. P. 12(b)(6); *Gomez v. Illinois State Board of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). However, the court may dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### B. *Choice of law*

■ As a preliminary, but important, matter, the court notes that defendants raise the possibility that either Illinois or Michigan law may apply to this case, but do not take a position on what the applicable law is. In fact, defendants merely pay lip service to the possibility that Michigan law may apply, since they virtually ignore Michigan law in their briefs. Plaintiffs also do not take a position on what state's law applies to this case, and mention no particular law in their amended complaint. They, too, cite mostly Illinois law in their response to defendants' motion to dismiss.

■ Because of the parties' somewhat cavalier treatment of the choice of law question, the court infers that they do not have a dispute as to what state's law applies to this case. As the Seventh Circuit has noted, "parties' agreement as to the application of a particular state's substantive law . . . [can be] inferred from their failure to make an issue of it. . . . Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." *Wood v. Mid–Valley Inc.,* 942 F.2d 425, 426–27 (7th Cir.1991). Accordingly, the court will apply Illinois law. *See ECHO, Inc. v. Whitson Co., Inc.,* 52 F.3d 702, 707 (7th Cir.1995) ("[w]here neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law").

■ Moreover, from the scant information relevant to the choice of law question that the court can glean from the amended complaint and parties' briefs, it appears that Illinois law would apply to this case. In deciding what state's law to apply, the court follows Illinois choice of law, principles. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In deciding choice of law issues, Illinois courts apply the "most significant contacts" test. *Palmer v. Beverly Enterprises,* 823 F.2d 1105, 1112 (7th Cir.1987); *Ingersoll v. Klein,* 46 Ill.2d 42, 48, 262 N.E.2d 593, 596 (1970). In contract cases under this test, the court considers the following factors: (1) the place of contracting; (2) the place of

negotiations; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, place of incorporation, and place of business of the parties. *Palmer,* 823 F.2d at 1108–09.

In this case, the parties have provided no information in the pleadings or otherwise about the first two factors. However, the amended complaint alleges that the closing for the sale of the I.P. business was to take place in Chicago. Thus, it is a reasonable inference that Chicago was the place of at least part of the contracting and negotiations. In addition, plaintiffs' principal place of business was Chicago. Thus, Illinois has significant, and possibly the most significant, contacts with the transaction at issue.

In any event, the court will apply Illinois law in deciding defendants' motion to dismiss.

## C. *Count I—Breach of contract*

Defendants contend that plaintiffs' breach of contract claim fails on two grounds. First, defendants contend that the seven acquisition agreements—the Asset Purchase Agreement and the six ancillary agreements—are unenforceable under various statutes of frauds. Second, defendants contend that Jellison had no authority to enter into an agreement for the sale of the I.P. business, and therefore that such an agreement never was formed.

### 1. Statute of frauds

Defendants contend that each of the seven acquisition agreements is subject to a particular statute of frauds, and each fails to comply with the applicable statute because, among other things, it is not signed by either party. In making their argument, defendants apply both the general statute of frauds and the statute of frauds under the Uniform Commercial Code ("UCC") to the agreements.

#### a. *Nature of agreement*

■ To address defendants' statute of frauds argument, the court finds it necessary first to address whether the sale of the I.P. business entailed seven separate agreements, each of which may be covered by a particular statute of frauds, or one agreement, set forth

in seven parts, to which only one statute of frauds may apply. Defendants argue that seven separate agreements are at issue, while plaintiffs contend that one agreement for the sale of the I.P. business is at issue.

Seven separate documents set forth the essential terms of the alleged agreement to sell the I.P. business. (*See* Am. Compl. ¶ 40; *id.* Ex. R, S, T, U, V, W, X.) However, plaintiffs allege that the Asset Purchase Agreement was the central acquisition agreement that contained the parties' intent and understanding regarding the transfer of the I.P. business. (*Id.* ¶ 40.a.) The other agreements contained the details about the transaction. (*See id.* ¶ 40.b.-g.) Moreover, throughout the amended complaint, plaintiffs refer to the sale of the I.P. business as one transaction, not a series of separate transactions. In addition, it appears from the pleadings that all seven agreements were negotiated and allegedly entered into at the same time.

The court is required to make reasonable factual inferences in favor of plaintiffs. *See Ellsworth,* 774 F.2d at 184. The reasonable factual inference to be drawn from plaintiffs' amended complaint is that the parties made one overarching agreement to sell the I.P. business, and then set forth the details of that one transaction in several subsidiary agreements. Defendants have not provided the court with any information that would show that this inference is untrue or unreasonable.

Further, it seems illogical to consider the seven agreements separately. For example, if the Asset Purchase Agreement failed, it is doubtful that the parties would go forward with the Lease Agreement. In short, the parties were negotiating for the sale of defendants' business, and the seven agreements embody the details of that one transaction.

Accordingly, the court will consider the agreement as one agreement.

#### b. *Applicable statute of frauds*

■ Illinois has on its books a general statute of frauds, which, among other things, requires signed writings for agreements that are not to be performed within one year; *see* 740 ILCS 80/1; and for leases exceeding one

year in duration. *See* 740 ILCS 80/2. Illinois also has a statute of frauds under the UCC, requiring a signed writing for a contract for the sales of goods over $500. *See* 810 ILCS 5/2–201. Thus, the questions that arise are whether different statutes of frauds can apply to the different agreements; or whether one statute applies to the entire transaction set forth in the seven agreements; and if the latter, which statute applies to the entire transaction.

Defendants believe that a different statute of frauds can apply to each of the seven acquisition agreements. In particular, defendants apply the statute regarding leases to the Lease Agreement; the UCC statute to the Asset Purchase Agreement; and the statute regarding performance within a year to the remaining five agreements. Plaintiffs, in turn, argue that the predominant purpose of the entire transaction governs which, or whether any, statute of frauds applies to the transaction. Plaintiffs contend that the transaction was the sale of an entire business, which was to be performed within a week of the agreement to sell the business. Thus, according to plaintiffs, no statute of frauds applies to the transaction.

The court already has noted that the transaction for the sale of the I.P. business involved one overarching agreement, which was detailed in seven separate documents. Thus, it would not make sense to apply more than one statute of frauds to the agreement. It remains to be seen which statute should apply to the entire agreement, however.

■ Plaintiffs urge the court to apply the "predominant purpose" test to the agreement for the sale of the I.P. business. Under this test, according to plaintiffs, the predominant purpose of the transaction was the sale of an entire business, to be completed within a week of the formation of the agreement. Therefore, no statute of frauds applies to the agreement.

■ Plaintiffs miscomprehend the breadth of the predominant purpose analysis. This test simply determines whether the UCC is applicable to a contract, not whether any statute of frauds at all applies to a contract. The test asks whether the predominant purpose of a contract is the sale of goods or nongoods. *See, e.g., Executive Centers of America, Inc. v. Bannon,* 62 Ill.App.3d 738, 742, 19 Ill.Dec. 700, 703, 379 N.E.2d 364, 367 (3rd Cir.1978); *Respect, Inc. v. Committee on the Status of Women,* 781 F.Supp. 1358, 1363–64 (N.D.Ill.1992); *Fink v. DeClassis,* 745 F.Supp. 509, 515–16 (N.D.Ill.1990). If a contract predominantly involves the sale of goods, the entire contract is subject to the UCC. *Respect,* 781 F.Supp. at 1363–64; *Fink,* 745 F.Supp. at 515. If the contract is primarily one for non-goods, it is tested by other legal standards, such as the general statute of frauds or common law. *See Respect,* 781 F.Supp. at 1364.

The court finds that the agreement in this case is a "mixed" one. The predominant purpose of the agreement was not merely a sale of goods, but the sale of a business with all of its tangible and intangible assets, including equipment, inventory, supplies, accounts receivable, records, and intellectual property rights. The agreement also provided for the leasing of employees, transition services and consulting, environmental liability indemnifications, a long term lease, and the sharing of certain space, materials, and equipment. In sum, the sale of goods, such as Donnelly's equipment, was just one part of a complex agreement for the transfer of a business from Donnelly to Midwest.

Defendants, however, contend that the value of tangible assets greatly exceeds that of intangible assets, and therefore that the agreement predominantly was for the sale of goods.[2] It is true that a few cases appear to look only at the value of assets involved in a transaction to determine the predominant purpose of the transaction. *See, e.g., Fink,* 745 F.Supp. at 516 (citing cases analyzing percentage of purchase price represented by goods) (citations omitted). However, "[t]here is no hard and fast rule for determining the predominant purpose of a mixed contract." *Respect,* 781 F.Supp. at 1364.

**2.** Plaintiffs' amended complaint lists the value of intangible assets at $7,418,233 and intangible assets at $3,331,868. (*See* Am. Compl. Ex. R.)

Furthermore, "predominant" is not defined solely in quantitative terms. "Predominant" means, among other things, "having greatest ascendancy, importance, influence, authority, or force." WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 927 (1984).

The court cannot say that a sale of goods was the most important goal of the agreement between Midwest and Donnelly. All seven of the agreements appear necessary to consummate the sale, and six of the agreements were not related to assets. Moreover, despite the lower monetary value of intangible assets, the court infers from plaintiffs' amended complaint that these were the assets most important to plaintiffs. For example, plaintiffs' amended complaint indicates that the reason plaintiffs wanted to acquire the I.P. business was to make use of the I.P. business's "patents, trade secrets, technology, and operating know how regarding both bent glass and the glass coating industry generally." (Am.Compl.¶10.) The transaction likely would have had little value to Midwest without the transfer of Donnelly's intellectual property rights related to the I.P. business.

Thus, regardless of the sales price of the tangible assets, the court finds that the sale of the I.P. business was not a sale of goods, and therefore that the UCC does not apply to the agreement. This is not to say that another statute of frauds does not apply to the agreement, however.

■ The court agrees with plaintiffs that the agreement was one for the sale of an entire business, and that the transaction was to be completed within a week of the reaching of the agreement. However, the agreement included a provision for a 10–year lease of defendants' manufacturing facility. Under Illinois law, a contract that involves a transfer of real estate, including a long-term lease, must comport with the statute of frauds related to real estate.

In *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217 (7th Cir.1988), the Seventh Circuit addressed whether a purported contract for the purchase of a group of food-related companies had to be in writing and formally executed. On the facts before it, the court held that the answer was yes. The court

stated that under Illinois law, contracts involving the transfer of real estate must be in writing and signed. *Id.* at 1222. The court noted that the alleged agreement for the sale of the companies involved the transfer of real property. *Id.*

Thus, the court agreed with the trial court that the alleged agreement, which was not reduced to writing and signed, violated Illinois' general statute of frauds regarding the transfer of real estate. *Id. See also Pond v. Sheean*, 132 Ill. 312, 323, 23 N.E. 1018, 1021 (1890) (contract involving personal property and real estate regarded in its entirety, and if void as to real estate, it is void as to personal property).

As in *Feldman*, the agreement for the sale of the I.P. property involves a land transfer covered by the statute of frauds, since the parties allegedly agreed to a 10–year lease with an additional five-year option. Though this lease was only a relatively minor part of the transaction, *Feldman* did not except minor aspects of a transaction from its rule that a contract involving a and transfer must be in writing and signed. Accordingly, the agreement for the sale of the I P. business is subject to Illinois' statute of frauds regarding land transfers. *See* 740 ILCS 80/2.

### c. *Whether the agreement satisfies the statute of frauds*

■ The important question now becomes whether the agreement was sufficiently reduced to writing and signed to satisfy the statute of frauds. Defendants, not surprisingly, claim that the signature pages signed by Jellison and included in the exhibits of plaintiffs' amended complaint do not satisfy the statute of frauds. Defendants contend that the signature pages are actually from earlier drafts of the documents that are included in plaintiffs' amended complaint, and therefore that they precede and are not related to the documents.

■ The Illinois statute of frauds requires contracts for a lease lasting longer than one year to be in writing and signed by the party to be charged. *See* 740 ILCS 80/2. Under the statute of frauds, no particular form of language need be used, as long as

the intention of the parties can be established. *Yorkville Nat'l Bank v. Schaefer*, 71 Ill.App.3d 137, 140, 27 Ill.Dec. 263, 265–66, 388 N.E.2d 1312, 1314–15 (2d Dist.1979) (citing *Lipkin v. Koren*, 392 Ill. 400, 407, 64 N.E.2d 890, 894 (1946)). In addition, the writing need not be on a single piece of paper, and all of the documents need not be signed, as long as the signed writing refers expressly to the unsigned writing or the documents are so connected, physically or otherwise, as to show that they relate to the same contract. *Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir.1992) (citations omitted); *Dickens v. Quincy College Corp.*, 245 Ill.App.3d 1055, 1060, 185 Ill.Dec. 822, 825–26, 615 N.E.2d 381, 384–85 (4th Dist.1993) (citations omitted). In other words, the documents that are signed must be signed with "the full understanding of the connections to the contract." *Dickens*, 245 Ill.App.3d at 1060, 185 Ill.Dec. at 825–26, 615 N.E.2d at 384–85 (citations omitted).[3]

According to plaintiffs' amended complaint, each signature page that was signed by Jellison was attached, at the time of the signing, either to a cover sheet describing what document it was that Jellison was executing or to the entire document. (*See* Am. Compl. ¶¶ 32–33; *id.* Ex. B through O). The lease agreement was one of the documents allegedly executed by Jellison. (*See id.* Ex. C.).

However, defendants contend that the signed signature pages were not physically attached to the actual documents that evidenced the parties' alleged agreement, but rather were attached to earlier draft documents. Thus, defendants argue that the signature pages do not relate to the parties' alleged agreement. In addition, defendants argue that the signature pages precede the alleged agreement, and therefore cannot satisfy the statute of frauds.

The court finds that defendants' arguments require the court to resolve questions of fact, making dismissal under Rule 12(b)(6) inappropriate. Defendants' arguments require the court to determine whether the signature pages were attached to draft or final documents; the content of the draft documents; whether the terms of the draft documents differed from the terms of the final documents;[4] when the parties reached agreement on the terms of the lease or any other aspects of the transaction; when the signature pages were signed; whether the signature pages were signed before or after the parties reached agreement on the lease or any other aspect of the transaction; whether Jellison signed the signature pages with "full understanding" of their connection to the agreement as a whole;[5] and, most important, what the parties intended by Jellison's executing the signature pages. The answers to these questions are not apparent from the pleadings.

The resolution of these questions is more appropriately reserved for summary judgment, if they can be answered by evidentiary

---

3. The foregoing cases involve a different statute of frauds—that relating to performance of a contract within a year, *see* 740 ILCS 80/1. However, both statutes of frauds have substantially the same wording regarding the writing and signing requirements. *Compare* 740 ILCS 80/1 (barring an action to enforce an agreement that is not to be performed within one year of the making of the agreement "unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized") *with* 740 ILCS 80/2 (barring an action to enforce a contract for an interest in land (*e.g.*, a lease) for a longer term than one year "unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized ...."). Consequently, the court finds that the foregoing cases are equally applicable to the issues in the present case.

4. The significance of the terms of the draft documents compared to the final documents is this: if the draft documents contained the same terms as the final documents, the signed draft documents may satisfy the statute of frauds. *See Bower*, 978 F.2d at 1009 n. 2, 1009 (where a signed writing expressly referred to an unsigned draft document, which contained the same terms as a different draft contract to which plaintiff had agreed, the unsigned draft document could be used to satisfy the statute of frauds).

5. It is inconceivable to the court that Jellison did not know that the signature pages were connected to the agreement for the sale of the I.P. business. At the time he signed the pages, he had spent upwards of nine months negotiating with Midwest for the sale.

submissions accompanying a motion for summary judgment, or trial. Based on plaintiffs' amended complaint and the reasonable inferences that the court can draw from it, the court simply cannot say that the signature pages appended as exhibits to plaintiffs' amended complaint fail to satisfy the statute of frauds.

### 2. Lack of authority

■ Defendants contend that the breach of contract claim fails for another reason—the Donnelly board of directors did not authorize the alleged final agreement for the sale of the I.P. business; thus, there was no final agreement. Specifically, defendants claim that consummation of the agreement was authorized only if the final agreement was consistent with the board's resolution. According to defendants, the final agreement was not consistent with the resolution because, at a minimum, the price term in the agreement did not contain an adjustment based on the balance sheet at the time of closing, as required by the resolution. Also, defendants claim that Jellison was not authorized to approve the agreement on his own, and that plaintiffs knew this. Last, defendants claim that the board approved a transaction only pursuant to the letter of intent. The letter of intent provided that a final agreement was to be reached no later than December 15, 1996, with a closing date no later than December 31, 1996, and that if those dates were not met, the letter of intent would terminate and the transaction be deemed abandoned. Because those dates came and went with no final agreement, according to defendants, the letter of intent expired, and with it, the board's grant of authority.

Defendants oversimplify the issue of authority. Regardless of the terms of the letter of intent or resolution, plaintiffs' amended complaint alleges facts that indicate that the parties continued to negotiate towards the sale of the I.P. business well past the deadlines established by the letter of intent. According to the amended complaint, Jellison handled all the negotiations on behalf of Midwest; Baumgardner apparently was not involved at all in the negotiations. Plaintiffs

allege that Jellison eventually agreed to the essential terms of the transaction, and the closing on the sale was to take place January 20–22, 1997. Thus, plaintiffs' allegations indicate that despite what the letter of intent and resolution provided, the parties disregarded the strict provisions in those documents and negotiated towards and reached a final agreement on the sale of the I.P. business.

Moreover, the court notes that nothing in the letter of intent prevented the parties from continuing negotiations and reaching an agreement after the expiration of the letter of intent. It appears that defendants are attempting to put such a restriction on the letter of intent only after the fact that the agreement fell through.

The court also is not persuaded that the paragraph of the resolution giving Jellison and Baumgardner authority to negotiate with Midwest and to consummate the transaction meant that *both* Jellison and Baumgardner had to negotiate and agree to consummate the transaction. The resolution provided:

> . . . Dwane Baumgardner *and* William Jellison are authorized to continue to negotiate with Midwest and to proceed with consummation of the transactions if, in *their* judgment, satisfactory definitive agreements consistent with this resolution can be achieved.

> . . . Dwane Baumgardner and William Jellison, *or either of them,* are hereby authorized to execute and deliver any and all documents and certificates which may be necessary or convenient in order to consummate the sale of the assets of the I.P. business, . . ., and are authorized to take any and all other action necessary in order to consummate the said transaction in accordance with this resolution.

(Mem. in Supp. of Defs.' Mot. to Dismiss Ex. 1 (emphasis added).) Defendants contend that because the first paragraph states that Baumgardner *and* Jellison were authorized to negotiate with Midwest and consummate the transaction, then both were required to negotiate and consummate the transaction.

Defendants' interpretation of that paragraph is neither obvious nor reasonable. The paragraph gives both Baumgardner and

Jellison authority to negotiate and use their judgment to decide whether to consummate the transaction, but it does not explicitly state that both must participate jointly in negotiations and agree on whether or not to proceed with the transaction. Moreover, such a reading is inconsistent with the second paragraph. If either Baumgardner or Jellison was authorized to execute any necessary documents to consummate the transaction or take any other action in order to consummate the transaction, then it would be contradictory to say that both were required to negotiate with Midwest and both were required to agree to consummate the transaction.

Defendants' argument essentially asks the court to construe the vaguely worded board resolution in defendants' favor and against plaintiffs. Because a straightforward reading of the resolution does not support defendants' arguments, but rather indicates that Jellison had authority to negotiate and reach final· agreement with plaintiffs, the court will not hold the ambiguously worded resolution against plaintiffs, who had no role in the drafting of it. To do as defendants ask would work an unfair result, especially since, according to plaintiffs' amended complaint, Jellison held himself out as having authority to negotiate towards and eventually consummate a final agreement on the sale of the I.P. business.

In short, defendants' actions during negotiations with plaintiffs were plainly inconsistent with their contentions now. Defendants continued to negotiate past the deadlines contained in the letter of intent; and Jellison alone handled negotiations with Midwest and allegedly approved the final agreement, which contained the purchase price provision that defendants now claim is inconsistent with the board resolution. At the very least, defendants' alleged conduct creates a question of fact about whether Jellison had authority to bind defendants to the agreement regarding the sale of the I.P. business. This question of fact makes dismissal of the breach of contract claim inappropriate.

### D. *Count II—Breach of duty to negotiate in good faith*

▋ Plaintiffs base Count II on the October 28, 1996, letter of intent and the Donnelly board of directors resolution, claiming that these documents created a duty upon defendants to negotiate in good faith with plaintiffs for the sale of the I.P. business. Reduced to its essence, Count II alleges that defendants breached their duty to negotiate in good faith by failing to reach final agreement with plaintiffs regarding the sale of the I.P. business. Defendants move to dismiss this count on the ground that a duty to negotiate in good faith cannot arise from an expressly non-binding letter of intent.

▋ The terms of a letter of intent between parties controls the extent of a party's obligation to negotiate in good faith. *See A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 873 F.2d 155, 158 (7th Cir.1989). Where a letter of intent expressly states that it is not a binding agreement and that the rights and obligations of the parties will be set forth in a definitive agreement, it is "merely an agreement to negotiate, not a promise that those negotiations would be fruitful." *Feldman,* 850 F.2d at 1221, 1223.

In the present case, the letter of intent provided that the parties "understood that this letter agreement is non-binding and that no legal action may be predicated [on it]." (Am.Compl.Ex. A.) The letter acknowledged that it was "a preliminary step to pursuing negotiations" regarding the sale of the I.P. business. (*Id.* Ex. A ¶ 12.0.) The letter required only that the parties not negotiate with others during the life of the letter of intent, and that they keep certain information shared during negotiations confidential. (Id. Ex. A ¶¶ 6.0, 9.0.)

Based on the terms of the letter of intent, the court finds that the letter imposed no duties on either defendants or plaintiffs other than not to negotiate with third parties while negotiating with each other and to keep certain information confidential. Defendants did not breach either of these duties. The letter of intent did not require defendants to consummate the sale of the I.P. business. Rather, it was "merely an agreement to negotiate, not a promise that those negotiations

would be fruitful."*Feldman*, 850 F.2d at 1223. Thus, defendants did not breach any duty to negotiate in good faith that was established by the letter of intent.

Accordingly, the court grants defendants' motion to dismiss Count II, since it fails to state a claim upon which the court can grant relief, Count is dismissed with prejudice.

### E. *Count III—Promissory estoppel*

██ Defendants premise their motion to dismiss the promissory estoppel claim on the same grounds as the breach of contract claim—statute of frauds and lack of authority. Thus, for the same reasons that the court denied defendants' motion to dismiss the breach of contract claim, the court also denies the motion to dismiss the promissory estoppel claim.

### III. *CONCLUSION*

For the foregoing reasons, the court grants defendants' motion to dismiss Count II and denies defendants' motion to dismiss Counts I and III of plaintiffs' amended complaint. Count II is dismissed with prejudice.